Thank you, Your Honors, and may it please the Court. This appeal presents the question of whether a patent owner can avoid a declaratory judgment action without issuing a covenant that covers all of the accused infringer's present activity and planned activity that is not speculative. Under all of this Court's precedents, the answer to that question is no. For a covenant to deprive the Court of jurisdiction, the covenant must at a minimum cover all present activity and planned activity that is not speculative, and the covenant at issue in this case does not satisfy this criteria. That is the rule of law. Mr. Midby, this is Judge Toronto. Can I explore what, at least for the moment, is central to my thinking about what to worry about here? So taking as a given the legal principle that you just asserted, it seems to me that your argument about planned activity pretty much comes down to the sentence in your January 13, 2020, counterclaim document number 28 that says, you know, we are buying and plans to buy some handles that sufficiently implicate the design patents that there's a real case of controversy. And here's what I'm trying to figure out. What the status of that document 28 is, the first amended answer and counterclaim. It looks to me under Rule 15 that you did not actually have a right to file that complaint. You needed court permission. No right, because it's more than 21 days after the answer, which was the responsive leading to that, and more than 20 days after the dismissal motion, or at least, sorry, more than 21 days after the dismissal motion, which was, which is enough under Rule 15A to mean that you need permission. It wasn't more than 21 days after the answer, but 15A1B says whichever is earlier. So it looks to me like that answer, the first amended answer and counterclaim is not actually part of the case. And without that, I don't see how your argument works. So can you address that? Well, Your Honor, first, I believe that the district court did consider it part of the case. I don't think number 28 is cited in the district court's opinion. I believe it makes rather good sense of what the district court said, that the court was focusing only on a set of activities that were, had been in the litigation earlier, the 100 units and so on, and it never actually said, here's a piece of docket entry 28 that contains this allegation with an Exhibit A with a picture of, or three pictures of three handles. And the district court just never addressed that, which seems reasonable perhaps, if that document was not actually properly filed, because you needed permission to file it and you didn't get it. You didn't even ask for it. That's what I'm struggling with here. I think, Your Honor, even if the district court properly didn't consider that amended pleading, there was still sufficient present activity at issue that the future sales identified in the amended counterclaim would not be necessary to sustain jurisdiction. Let me explain what I mean by that. Under the original counterclaim, which did seek a declaration of invalidity and non-infringement, the challenge, there were sales that were challenged by the plaintiff that had occurred in the past that were not covered by the covenant not to sue. F1 Firearms had sold a multitude of different handles, including one mil-spec handle that met the definition of accused products laid out by AXTS and it's cited on appendix page 290 through 293. And those sales had occurred in the past. They were in controversy, but they were not the subject of a license according to the very limited covenant that AXTS provided, which is limited to 100 charging handles that they viewed as a direct copy of the one that they were offering on the market. So I would submit, Your Honor, that even if you're correct that Rule 15 didn't allow amendment as a matter of right by that point in time, that there were still sufficient past sales that the district court had to retain jurisdiction to decide at least that question. But the past But the covenant didn't cover all of the past sales, Your Honor. The covenant was limited to only 100 charging handles, which were the ones that the plaintiff claimed were a direct copy of their product. It didn't cover other charging handles that had been sold in the past that would fit within the definition of accused products. And I'm talking specifically about the definition on page 290 of the record that says a centrally disposed symmetric arch and flat top. That covers an awful lot. They were not pursuing infringement claims as to those. They did after they in their final brief to the district court, they said that they weren't pursuing infringement claims, but they didn't give us a license and they would have to give us a license. They dismissed the case without prejudice. They didn't actually say that those handles didn't fit within the definition of their patents or that they didn't infringe. And I would submit, Your Honor, that they would, at a minimum, have to do that. They would have to concede non-infringement or give us a license. And they never did. If they were not pursuing them in that case, and they had originally asserted them, then if the race judicata bar would prevent them from ever pursuing them in the future, isn't that right? I don't think it would based on the way that they dismissed the case. They dismissed the claims without prejudice, and they never made an statement that those handles either didn't infringe or that they were licensed. All they said is that they weren't pursuing them. That's consistent with dismissal without prejudice and just getting rid of the case in order to fight another day. So under the way that AXTF dismissed that and under the representations that they made to the court, they have the ability to come back and sue over those same accused handles again, which I will reiterate involve this centrally disposed symmetric arch and flat top, according to AXTF's definition. And that covers virtually every handle that F1 ever sold. So even if we don't reach the possibility of future sales, there are sufficient past sales that weren't licensed and weren't specifically disclaimed as being non-infringing that require the district court to take jurisdiction over the case. The Revolution Eyewear case, I believe, is directly on point with that. In that case, Judge Newman wrote, whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant. We agree with that statement. The covenant was expressly limited in this case to 100 charging handles and did not cover the other multitude of past sales that fit within the plaintiff's definition of the accused products. And so this is not a situation where a would-be competitor is trying to test the waters. This is a situation where F1 firearms need certainty about whether those past sales which in its original counterclaim are covered by the covenant not to sue or have been specifically disclaimed as non-infringing. The covenant in the Revolution Eyewear case was actually much broader with respect to the accused infringer than the covenant that AXTF has offered here, because in Revolution Eyewear, the covenant did cover all past sales. In fact, that was specifically stated in the opinion. The covenant covered all past manufacturing sales and uses of the eyewear product at issue. Whereas here, AXTF specifically stated that they weren't licensing anything other than the 100 charging handles that they had identified. So we don't have to get to the issue of future activity. There's sufficient past activity to require district court jurisdiction. And this has a practical impact because in this case, F1 is a growing company that is expanding its sales base. And if the court allows AXTF to just walk away from this claim without issuing a license or specifically disclaiming infringement, then AXTF can wait up to six years, super damages, and wait and see whether F1 makes enough sales to make the case economically justifiable. The court will remember that AXTF didn't dismiss this case because they thought there was no infringement. They admit that they dismissed the case because they didn't think that it made economic sense to pursue. And that leaves... This is just Toronto. Would it not be right that if everything that was part of the case before your first amended counterclaims did not support a case or controversy, and if it were also true that what you allege in the amended counterclaim in docket entry 28 wasn't considered because it was never properly filed, then you can file a new declaratory judgment action, can't you? If you think that and say, we actually are selling these things now. They haven't been controversial. We could file a new action, but I don't think we have to file a new action, your honor. I believe that the current action is sufficient because the case or controversy existed at the time that we filed those counterclaims. And your honor, to back up and address your original question, I just confirmed that the docket control order in the case gave the parties until March 6th, 2020 to amend pleadings without leave. So we actually did have a right... So where is that? I'm looking for it in the record. My colleague just identified to me that the docket control order actually included that deadline. And I think that that would indeed make a difference if the court is inclined to view the amended pleading as not being part of the case. The docket control order does state that, which is why it was not an issue that either side briefed or really addressed in connection with the original briefing filed in this court. Right, counsel. And I'm sure the other side will tell us if you're right. But even if you are right, the district court specifically said that there just wasn't enough detail or information. It was just vague. Why isn't that sufficient for the district court to say that it's inappropriate to exercise D.J. jurisdiction in those circumstances? Because there was sufficient information on two counts. And just to back up to the original point, if the court looks at appendix page nine, that deadline is listed there. So the docket control order deadline is in the record. And we did have the right to amend without leave of court under these circumstances. But to answer your question, Your Honor, there were two ways in which we made it specific. We said that the covenant didn't resolve pass-fails, and we identified three specific charging handles that F-1 had a present intent to source and put on its selling. So it was specific and it was non-speculative. And that's the standard of Revolution Eyewear. Revolution Eyewear, all of the past sales and manufacturing of the product were licensed prior to the date of dismissal. It was just the future sales and the future manufacturing that was not covered. But Revolution Eyewear had a present intention to proceed with the same design, and F-1 stated in its counterclaim that it had a present intention to continue proceeding with designs that would allegedly infringe the patents ensued and identify... It said it was looking to source products, and it didn't really say where or what the products were, right? In Exhibit A to the amended counterclaim, F-1 did identify those so it was a highly specific acknowledgement of what the handles were. And these are handles that are available on the open market. When a company buys charging handles to put into a rifle, they source them from a third-party supplier. They go onto the open market and choose among the many options that are out there on the market. And in this case, F-1 said, we are going to go buy these three handles that have been accused of infringing the AXTS patents and put them in our current inventory of rifles. It couldn't be a more... It is. I mean, we're talking about the court assessing whether or not you provided sufficient detail. So you're asking us to conclude that the district court clearly erred in that factual determination. I am asking the court to conclude that the district court clearly erred on that because I don't know how much more specific we could have been. We identified specific products in Exhibit A, and it's that record site appendix 279. We identified the Griffin armament, we identified the next level armament, and we identified the battle arms development. We even provided pictures and we provided the sales website where you can go and order a shipped to your manufacturing facility. Again, it's that appendix 279. There's no way we could have been more specific about our future intent. Counsel, even if we were to send it back for purposes of examining the question of whether you were specific enough, the district court would still have the discretion to say that in these circumstances where there is no actual threat of infringement with respect to any particular handle, that the court would have the right to decline to exercise DJ jurisdiction because it's all discretionary, right? I don't think that that's necessarily the case. I think under the standard of MedImmune, the district court would be at least strongly encouraged to take this case because there's a real threat that we would be sued for infringement based on the plaintiff's conduct in making the very infringement claim that we're trying to litigate and then trying to abandon. Well, I don't think MedImmune would be enough to say that you can do something because you think it might infringe in the future even though no one's ever claimed that it infringed. We submit, Your Honor, that they did claim that it infringed based on the definition of what's the definition of an accused product. AXTS is trying to say retroactively that the accused products were a lot narrower than what they told the district court. But in reality, they told the district court at Appendix 290 through 293 that a charging handle would infringe if it met one of three different criteria, one of which is having a centrally disposed symmetric arch and a flat top. And then there are two other independent criteria that AXTS claims is enough to cover the scope of their patents. And they didn't actually stop there with the definition of accused products. They submitted a declaration at Record Appendix 179 where their lead counsel affirmed that the definition of accused products are actually covered by the three design patents in suit. He used that language. He said that requests included a definition of accused products that described the charging handle design covered by each of the three design patents in suit. So AXTS represented to the court that the design scope of material. And all we're asking for is a declaration from the court as to whether our past sales, which fall within that definition, and the future specifically planned sales, which fall within that definition, are subject to liability. Because otherwise, F1 faces the risk that they will accrue damages and potentially damages for willful infringement if this case is not resolved. That's the problem presented here. It can't be the case that a plaintiff can file a lawsuit, accuse a broad range of products of infringing, then dismiss that lawsuit if they decide that there haven't been enough present sales to justify the litigation economically, wait several years, and refile that case, seeking to capitalize on the sales that the isn't any case law that suggests that the law allows that. Both the Benetech case and the Revolution Eyewear case make clear that if you have present activity or planned activity that is not speculative, that we are entitled to a declaratory judgment. And I would add, in response to the question about discretion, that at least the case should be sent back to district court for the court to consider whether it should exercise its discretion to hear this case. Because our identification of products that fell within the scope of accused products was highly specific. Any more questions for Mr. Mitby at the moment? Hearing none, we'll hear from Ms. Jones. Thank you, Your Honor. May it please the court, Miranda Jones for the Appley AXTS. AXTS requests that this court affirm the district court's dismissal of F1's declaratory judgment counter claims. I'd like to start by addressing the question that Judge Toronto raised with respect to whether F1's amended pleading was properly before the court. F1's counsel is correct that there was a date in the scheduling order that permitted filing amended pleadings. But if you look at the scheduling order itself, which I do not believe is included in the appendix to the court, it says that if the amendment would affect preliminary infringement conditions or here, the amendment that F1 was making to its counter claims would have impacted potentially the preliminary infringement conditions or preliminary invalidity contentions. No motion was made to put that pleading before the court properly, and so that pleading was not before the court. But beyond that, AXTS's covenant not to sue fully extinguished the dispute as to the 100 charging handles that were initially before the court. And those were the only charging handles that were executed in front of the court. Sorry. This is Judge Toronto. So there are, let's call them the three amended counter claim units that were involved in the case, and then these three Exhibit A units that are referred to and pictured in February 2019 amended. Let's start with the first group. In that first group, I think counsel on the other side said that there are units beyond the 100, the 100 being the only subject of the covenant, that he doesn't think you made a sufficient disclaimer of infringement to allow them to go forward, the defendant here, to go forward and sell those. Can you address that? Have you, in fact, disclaimed infringement of all but the 100 units that were in the case before January 30th? Your Honor, I believe that our infringement contingents only focused on four units. And when we received the picture of seven units that F-1 identified as units it sold or used, there was only overlap of one unit that was not an AXTS sold unit. And that one unit I referred to in the brief as charging handle number three. And as to that charging handle number three, F-1's position was that there were only approximately 100 units that had not been returned and that were at issue. And so AXTS issued a covenant not to sue with respect to those 100 charging handle units. I heard counsel on the other side to say, and maybe I misinterpreted, that there were units in the case before January 13th, 2019 that are not covered by the covenant and that are not covered by any kind of binding disclaimer of infringement from you. So I'm not entirely clear what counsel for F-1 was referring to. But my understanding is that we have disclaimed infringement as to the units that were at issue prior to the amended counter which were represented by the seven units that are shown at appendix 566. And so those seven different models of charging handles that F-1 itself identified were the only ones that had been used or sold at that time. We've addressed all of those. Either they weren't ever accused of infringement or they're covered by the covenant not to sue. So I think his point is that even if you didn't specifically accuse them of infringement, your definition of accused product would seem to cover them. Is that wrong? I would submit that that is wrong, that there is not any case that would support looking at a definition that is in a discovery document. So this was in the request for production of documents where we're trying to gather information that would inform the infringement contentions as a basis of an accusation of infringement. So you're saying those other products that he's talking about just don't even appear in the infringement contentions? They were not accused in the infringement contentions. And I'm not clear beyond where counsel points to the definition in the request for the production of documents. I'm not sure that there is any specific model that he's identifying as a model that was at issue that we have not given them a covenant not to sue upon. Okay. So you're saying that the request for production of documents might have been broader than what you were actually accusing of infringement, but what you were accusing of infringement shows up in the infringement contentions, period? That's correct, Your Honor. Okay. And further, that any of those seven units that you have not accused of infringement, do you agree that you could not legally, whether by judicial estoppel or otherwise, accuse them of infringement on a going forward basis? That's correct, Your Honor. With respect to charging handle number three as it's identified in that Appendix 566, it is a product that has been returned and that the manufacturer is now deceased and it's no longer being made. And so my understanding is that there is no dispute about future units as to that specific charging handle. The other units that were AXTS units, I believe there was one or two that inadvertently was included in the infringement contentions because we were not certain of the source. Once it was confirmed that those were from AXTS, we made it clear that we're not accusing the units that AXTS sold to F-1 of infringing. And going forward, F-1 has indicated that it no longer intends to purchase AXTS's own units. And then there were two other units, I believe, that appeared in that picture that were never accused of infringement in the infringement contentions. And just, I mean, just to be absolutely clear about what I'm after, I want you to say, and as to those two units, you agree that your client cannot accuse those units of infringement in the future? Yes. And just so we're entirely clear. Between what you didn't say and what you are now essentially asserting to be a freedom that the defendant has not to worry about those units being infringed, being accused of infringement. Can you make that assertion? Yes. We have not accused unit one or two that appears at appendix 566 of infringement. And there is no intention to accuse those two units of infringement. And you made that clear to the district court? Yes, they were not. These units were in the documents that were submitted to the court. And we've made clear by this annotated copy that is in the record here that these were not accused of infringement. And can I now just turn to the exhibit A point at appendix 279, which is the pictures of the three units that in paragraph three of the amended counterclaim on page 262 of the appendix are expressly said by AXT. I mean, AXT has put the typo. It should be F1 is sourcing the charging handles attached as exhibit A. I assume that's a typo since they're talking about themselves. F1 is. What is your view about whether those three pictured handles in exhibit A are potentially infringing or not? So at this point in time, F1 has never accused those units of infringing. Those units are, as far as I can tell, seeking to source those additional three charging handle models means that those models appear to be available on a third-party manufacturer's website for sale. There's no allegation that F1 has undertaken any steps to acquire them or enter into any kind of relationship or has any concrete plans with those manufacturers to undertake any activity that would constitute an infringing act here. And so we have not had the opportunity to analyze those three charging handles, but it would be... And do you think that the district court in deciding that there was no continuing case or controversy drew any conclusion about those three handles? So as Your Honor pointed out earlier, the district court judge did not specifically reference the amended pleadings in the order, and it appears that the judge below did not consider that the amended counterclaims were properly before the court, although there's nothing in the order that expressly makes that clear. So it is a little bit of a point of unclarity in the record, exactly what the district court judge was considering as properly before it or not before it. And just looking back over the actual order, the order appears to focus just on the 100 charging handles that the parties had previously discussed, although at some points the judge does mention relying on Benetech that there weren't any other additional details about other charging handles to the extent that those were before the court. That would be a slightly odd thing to say, given the pictures in Exhibit A, particularly odd for design path. Right. And I believe... I'm sorry, Your Honor. I didn't mean to interrupt there. I believe what the district court judge was indicating as far as additional details is that there was no indication beyond pulling something from a third-party manufacturer's website that F1 had any intention of actually doing anything with those third-party charging handles. So they hadn't made them, they hadn't used them, they haven't offered them for sale or sold them. So there are no allegations to that extent in the amended counterclaims, and there's no description of concrete steps to undertake some act of infringement. So if all F1 has to do is pull some other units or some other models from third-party manufacturers' websites to establish a sufficient case of controversy, I think that that raises a lot of concerns in terms of, you know, if there was a remand on that basis, are we going to have to look at every, you know, potential charging handle that they could buy out there? Would they really be in a position to do that? No, it would just be the ones that they suggestively assert they are sourcing, if sourcing means looking to buy so they can attach them to their firearms for resale. And I think that the level of activity there was not sufficiently alleged in the amended complaints to the standard that, or sorry, the amended counterclaims to the And so I would just also point out that there is a concern, perhaps it's more of a policy concern here, that if you allow F1 to place at issue another manufacturer's product and the question of whether or not that product infringes, where that manufacturer has no relationship with F1, that manufacturer has no interest in the case, there is a question about whether F1, who hasn't undertaken any activity that would traditionally constitute infringement, would really have a motivation to defend that third-party manufacturer's products against an allegation of infringement. And so I think that this illustrates the lack of connection between the parties here and that there is not a real case or controversy over these particular units. And then also, in terms of timing, I would point out to the court that at the time that F1 submitted its amended counterclaims, AXPS had already given it the covenant not to sue, we'd filed a motion to dismiss, and so the case or controversy was fully extinguished. It was only when they filed their opposition that they raised these additional units. And by that point in time, the more appropriate way to raise that would have been filing a new case instead of filing amended counterclaims. Thank you, Your Honor. Any more questions for Ms. Jones? Not for me, I think. No, thank you. Okay, thank you. Then Mr. Mitby, you have some rebuttal time. Thank you, Your Honor. This is a very unusual case in which the covenant that the charging handled, and as a result, it doesn't cover all of F1's present activity, and it doesn't cover any of F1's planned activity that is not speculative, to quote from Revolution Eyewear and Benetech. And as such, that covenant is insufficient to resolve the dispute. My colleague pointed out that the definition of accused products first appeared in a discovery request, and while that's certainly true, it wasn't a discovery definition because on page 179 of the record, AXCS's prior counsel, Mr. Heiser, submitted a declaration in which he stated, and I quote, the request included a definition of accused products that described the charging handle design covered by each of the three design patents in suit. So Mr. Heiser was representing that that definition explained the scope of the patents. It wasn't just being used as a fishing expedition. It was consistent with the scope of the patents, and he represented that to the district court in a declaration. And so how much clearer would AXCS have to be in stating that that's the definition that should control when looking at whether an the initial hundred handles, they broadened the definition to include a lot of other handles that F1 had sold in the past and was planning to sell in the future. And as to the future products, the specificity required, we stated in the counterclaim that F1 has a present intent to source all three of the handles shown in Exhibit A at Appendix 279. The point of this is F1 and most rifle manufacturers don't make their own handles. They source them, and we actually provided not only a picture of the handle and the name of the handle, but the website where we were planning to buy it from. We couldn't have been more clear that we were intending to buy those products, and therefore it is planned activity that is not speculative within the definition of Revolution Eyewear. I think it's important to recognize that in broad enough to cover all past infringing activity. It covered the making, the using, and the selling of the eyeglass product that had happened. I'm sorry, your honor. The covenant in Revolution Eyewear covered all of the previous activity, and the only dispute left was whether that company aspects could continue to sell a similar design in the future, and this court held that it presented an actual controversy because it was future activity that was non-speculative. It's clear that under this court's precedent and under the Supreme Court's precedent in Metamune that we don't have to actually take the step of infringing in order to file a declaratory judgment action, and in this case we've identified future products that we intend to buy, and the only step that we would have to take in order to infringe is to actually put them on a rifle. So under the Supreme Court's precedent in Metamune... Whether that's true seems to me to depend rather a lot on what this word sourcing means. It could be looking around to consider, or it could mean something more concrete and definite about an imminent purchase, and if it's the former that might not actually be enough, but I guess I'm not entirely sure what that word means. Well, it means the latter, your honor, because in this case it wasn't just looking around at potential suppliers and deciding which ones we wanted to consider. It was identifying three specific products that looked an awful lot like the hundred or so charging handles that were like them. So F1 was trying to replace like for like, as is apparent from the choice of handles reflected in Exhibit A. If you were to file a new declaratory judgment action, that would provide you an opportunity to be more concrete and specific, wouldn't it? It would, but respectfully, your honor, I don't believe we have to file a new declaratory judgment action, and it would make little sense from the point of judicial efficiency to assign that case to a new judge and go through the delays inherent in the filing process. It makes sense for the district court, which has already had some exposure to ASDS's claims, to decide this case as a matter of judicial efficiency. Well, it wouldn't really go to a different judge. It would probably go back to the same judge as related to an earlier case, correct? It might. It's always difficult to know. It's always difficult to know how that would end up, but at a minimum, there would be practice related potentially to venue and other types of issues that we don't have in this case since AXDS is the party that filed it. AXDS brought the lawsuit, and so therefore, the case law has traditionally recognized that a defendant is entitled to file a counterclaim of the sort that we did, and I'm not aware of a precedent that says that we would have to file a new action or should file a new action under these circumstances. And again, I look back at the docket sheet on page 9, and there does not appear to be any restriction on the ability of F1 to file the amended counterclaim that's at issue here. It was within the deadline of March 20th, 2020. Right, but as Ms. Jones said, the docket control order does expressly say if the amendment...note if the amendment would affect preliminary infringement contentions or preliminary invalidity contentions, a motion must be made pursuant to the patent. I don't see that in the record, Your Honor. It's possible, but... From the...you can get the record from Pacer, and the order that...it's not in the joint appendix. It is in the record, and, you know, it took a few minutes to follow up. Sure, and that's right, and we would submit that the counterclaim wouldn't affect the scope of the infringement contentions because AXDS had already identified through its definition of accused products what it thought infringed. Any more questions for Mr. Mitby? No. Okay, hearing none, all right. In that case, with thanks to both counsel, the case is submitted, and that concludes this panel's argued cases for this morning. Thank you. The Honorable Court is adjourned from day to day.